[Civ. No. 4136. Third Appellate District.—October 14, 1930.]

MARGARET INGAMELLS et al., Respondents, v. JACK GOODFELLOW et al., Appellants.

Griffith Jones for Appellants.

Griffith & Thornburgh for Respondents.

MR. JUSTICE LUTTRELL Delivered the Opinion of the Court.—This is an action for damages for alleged malpractice.

Plaintiffs are husband and wife, residing at Santa Maria, in Santa Barbara County, California. Defendants are duly licensed osteopathic physicians and surgeons practicing their profession together, as copartners, at said place. On May 1, 1926, plaintiff, Margaret Ingamells, consulted defendants professionally and was advised by them to have her tonsils removed. On June 10th of that year such operation was performed upon her by defendants, Dr. Goodfellow doing the actual operating and Dr. Bell administering the anesthetic. For a time after the operation Mrs. Ingamells ran a temperature and her throat did not heal as it ought, and defendant Dr. Bell prescribed a gargle for the trouble. In about three months she began to suffer from rheumatism and neuritis in her arms, legs and back. She consulted the defendants regarding same and they advised an X-ray of her teeth. They X-rayed one of her teeth and her dentist, Dr. Dart, X-rayed some of them. Defendants advised the extraction of one of her teeth and she had this done, but her

condition did not improve. In about six months' time after the tonsil operation a large swelling appeared on the right side of her neck and defendant Dr. Bell, being called and after examining her throat, prescribed a gargle. On this occasion he advised her that a certain tooth was causing this swelling and the rheumatism, and advised her to have this tooth extracted. Defendant Dr. Goodfellow also looked at her throat about this time and prescribed hot applications. Her dentist, Dr. Dart, examined the tooth in question and pronounced it a good tooth, but under the advice of defendants same was, on January 4, 1927, extracted and found to be a good, live tooth. The hot applications gave temporary relief, but in about three weeks' time the swelling on her neck grew worse and Mrs. Ingamells consulted a Dr. Coblentz, who advised that the right tonsil was bad and should be removed immediately. Plaintiffs then went to San Luis and consulted Dr. Proudfoot, a specialist. On the following day they again called upon defendant Dr. Goodfellow, who, at their request, examined Mrs. Ingamells' throat and offered to operate again, if plaintiffs desired him to do so, and upon their refusal to have him operate again, he offered to pay their expenses to Los Angeles to have his brother, a specialist, operate, provided he should find that his said brother was not coming to Santa Maria. After waiting several days and learning that Dr. Goodfellow's brother could not come from Los Angeles for at least two weeks' time, plaintiffs again consulted Drs. Coblentz and Proudfoot, who advised an immediate operation. After waiting for about two weeks, and Dr. Goodfellow's brother not having come to Santa Maria, plaintiffs went to Santa Barbara and consulted one Dr. Wells, an ear, nose and throat specialist. He examined Mrs. Ingamells' throat and neck and found pieces of tonsil on either side of her throat. The piece on the right side contained pus and was bound in by adhesions from a partially removed tonsil. The pillars of the tonsil had been cut and segregated and were partially covered over. He also found an enlarged lymphatic gland on the right side of the neck. He diagnosed her rheumatism and the swollen condition of her neck as being caused by absorption from this remnant of tonsil, and advised an operation at once. The following day, February 12, 1927, at St. Francis Hospital, he operated and removed the remnant of the right tonsil.

About two days after this operation the temperature, which the patient had been running since the swelling in her neck had first appeared, subsided. Dr. Wells treated the swollen neck for a time, and on March 14, 1927, operated on same by lancing it. This operation left a permanent scar on the neck. Shortly after the operation on the neck the swelling began to go down, the rheumatism to disappear, and the patient began to recover her health. Mrs. Ingamells was confined to her bed a considerable portion of the time between the operation performed by the defendants and the ones performed by Dr. Wells. She suffered much pain, and was unable to perform her usual household duties.

On June 9, 1927, the present action was instituted, the basis of plaintiffs' claim being alleged negligence of defendants in the operation performed, and in the treatment following same. Defendants denied any negligence upon their part. The cause went to trial before the court sitting with a jury and a verdict was rendered awarding damages in the sum of $2,304. Judgment was thereupon entered in plaintiffs' favor for this amount, with costs. A motion for a new trial was made and denied, and this appeal was then taken, in the alternative method, from such order denying a new trial and from the judgment. ■■■ Inasmuch as no appeal lies from an order refusing a new trial, we will proceed to consider the appeal as being from the judgment only.

Appellants rely for a reversal of the judgment upon the refusal of the trial court to give a certain requested instruction, hereinafter noted; error of the court in the rejection of evidence, and also upon the claim that the verdict was contrary to the evidence and against law.

The history of the case, as hereinabove narrated, is in accordance with the facts as given by the witnesses called by the respective parties. In fact, there is not much dispute between the parties as to the facts of the case. Appellants, in effect, admit that in operating they left a portion of the right tonsil in Mrs. Ingamells' throat, but take the position that this does not constitute negligence, as they claim that it is a thing that frequently happens with physicians and surgeons engaged in general practice, in tonsil operations, and even with throat specialists, and further, that in the removal of diseased tonsils the supporting walls of the throat are often unavoidably injured. In addition to this defense they

assert, and at the trial attempted to prove that Mrs. Ingamells' condition was caused by poison from diseased teeth, rather than from the portion of the diseased tonsil which they left in her throat.

The law pertaining to the care and skill required of physicians and surgeons in operating upon and treating patients is well settled. In the case of *Pike* v. *Honsinger*, 155 N. Y. 209 [63 Am. St. Rep. 655, 49 N. E. 762], cited with approval by our own Supreme Court in the case of *Hesler* v. *California Hospital Co.*, 178 Cal. 764 [174 Pac. 654], the law was stated in the following language: "A physician and surgeon, by taking charge of a case, impliedly represents that he possesses, and the law places upon him the duty of possessing, that reasonable degree of learning and skill that is ordinarily possessed by physicians and surgeons in the locality where he practices, and which is ordinarily regarded, by those conversant with the employment as necessary to qualify him to engage in the business of practicing medicine and surgery. Upon consenting to treat a patient, it becomes his duty to use reasonable care and diligence in the exercise of his skill and the application of his learning to accomplish the purpose for which he was employed. He is under the further obligation to use his best judgment in exercising his skill and applying his knowledge." Numerous other authorities might be cited in support of this proposition.

Negligence on the part of a physician has been defined as consisting of his doing something which he should not have done, or in omitting to do something which he should have done. (*Perkins* v. *Trueblood*, 180 Cal. 437 [181 Pac. 642]; *Houghton* v. *Dickson*, 29 Cal. App. 321 [155 Pac. 128]; *McGraw* v. *Kerr*, 23 Colo. App. 163 [128 Pac. 870].)

As to what is or is not proper practice by a physician and surgeon in the examination and treatment of a patient or what is or is not the usual practice and treatment is a question for experts and can be established only by their testimony. (*Houghton* v. *Dickson*, *McGraw* v. *Kerr* and *Perkins* v. *Trueblood*, *supra*.)

Applying these rules of law to the case before us, the question presents itself as to whether or not the defendants possessed that degree of learning and skill ordinarily possessed by physicians and surgeons practicing in the locality where this operation and subsequent treatment occurred,

and whether or not they exercised such required reasonable and ordinary care and diligence in operating upon and subsequently treating the plaintiff Mrs. Ingamells. Did these physicians and surgeons do something which they should not have done or omit to do something which they should have done? The record shows that in addition to presenting to the court and jury their own testimony in support of their complaint, plaintiffs called as witnesses in the case Dr. Charles S. Stevens, a duly licensed physician and surgeon, of Santa Barbara, who had at that time been practicing his profession there for fourteen years, and also Dr. George S. Wells, the specialist of Santa Barbara, who performed the last operation upon Mrs. Ingamells' right tonsil and also operated upon her neck, as hereinbefore noted. They also called Dr. E. K. Dart, the dentist, who X-rayed and extracted two of her teeth. Dr. Stevens testified that he was a graduate of the medical department of the University of Minnesota and in his practice had removed tonsils and knew the technique involved therein, and that he also knew the standard set by physicians and surgeons in the community where the operation in question was performed. He further testified that a physician and surgeon, in the exercise of ordinary care and skill, at the time and place when and where the defendants operated upon Mrs. Ingamells' throat, should remove tonsils cleanly and without damage to the neighboring tissues. In other words, that the leaving of a portion of a tonsil in the throat and the cutting of the pillars of the throat in operating was not the exercise of that degree of skill and learning ordinarily possessed by physicians and surgeons in that locality. He also stated that the leaving of a portion of a tonsil in the throat and the cutting and lacerating of the pillars of the throat so that they would grow together over the piece of tonsil left in, would cause the patient to suffer from aseptic absorption of the infected portion of such tonsil left in and might result in swollen glands, rheumatism and heart trouble. He further testified that a physician, who has performed an operation for the removal of tonsils and has left a portion of a tonsil in the throat, would be able, either in a week, in three months or in six months after such operation to determine whether or not, in operating, he had failed to remove all of the tonsil and further that such physician would not, in the exercise of

ordinary care and skill, diagnose a swelling occurring in the neck of the patient subsequent to such operation, on the same side thereof as that in which the portion of the tonsil was left, as being caused by a bad tooth, but that in the exercise of ordinary care and skill he would diagnose the swollen neck as being caused by the absorption of poison from the portion of the tonsil remaining in the throat. Dr. Wells, the ear, nose and throat specialist, who was a graduate of Cincinnati Medical College, and who had been practicing in Santa Barbara since 1911, and who, as heretofore stated, performed the last operation upon Mrs. Ingamells' tonsil and lanced her neck, testified to the same effect in these regards as did Dr. Stevens. He was positive that her trouble and suffering had been caused by poison from the portion of the infected right tonsil which had been left in by defendants when they operated, and not by any bad teeth. Dr. Dart, the dentist, testified that neither of the two teeth which he extracted, under defendants' direction, contained pus sacs. The defendants, in attempting to justify their acts in leaving a portion of the tonsil in Mrs. Ingamells' throat, called Dr. Louis C. Chandler, who is a graduate in medicine and osteopathy of the University of California and who had been for fourteen years connected with the public school clinic of Los Angeles. Dr. Chandler testified that in from fifteen to twenty-five per cent of the cases in which tonsils have been removed by general practitioners, portions of the tonsils are left in the throat and are visible after the operation. He further testified that teeth with pus sacs at their roots frequently cause rheumatism and neuritis, and that it is not possible to tell whether rheumatism is caused by ulcerated teeth or bad tonsils when one has both such teeth and tonsils. He also stated that glandular infection can be caused by infected teeth. This witness admitted that he had not operated upon anyone's tonsils for fourteen years, or since he was a student.

From this review of the principal evidence given at the trial we think that it is demonstrated that the jury's verdict in plaintiffs' favor was justified by the evidence and is not contrary to the law.

We will now consider the claimed errors of the court in the refusal of an offered instruction and in the rejection of evidence. Defendants offered and the court refused to

give the following instruction: "You are instructed that unless the plaintiff proves by a preponderance of the evidence that the defendants knew, or ought to have known, that the consequences complained of would result from their acts or treatment, you must find for the defendants." In contending in their brief that the court erred in refusing this instruction, counsel for appellants content themselves with a mere citation of two California cases and a citation from California Jurisprudence, together with a brief quotation from one of the cases cited. The cases cited are: *Perkins* v. *Trueblood,* 180 Cal. 437 [181 Pac. 642], and *Houghton* v. *Dickson,* 29 Cal. App. 321 [155 Pac. 128], and the citation from California Jurisdrudence is found in volume 20 of that work on pages 1074 and 1075. No argument is made by them upon the point, and no effort whatever has been made to show wherein the error, if error it be, was prejudicial to appellants. Under these circumstances we perhaps could with propriety disregard the point; however, we have given same due consideration and have concluded that the court was right in rejecting the instruction. Neither of the cases cited as supporting this instruction can be fairly construed as sustaining any such proposition as is therein contained. Had the court given the proffered instruction it would have been tantamount to the court saying to the jury that a verdict should be returned in favor of the defendants, unless the plaintiffs had proven by a preponderance of the evidence, that defendants knew, or ought to have known, when they performed the operation and left a portion of a tonsil in the throat and cut some of the pillars of the throat, or when they failed to discover what they had done in this regard after the operation, or failed to properly diagnose and treat the ailments of their patient following the operation that, for example, the patient would subsequently have to submit to another operation which would leave a permanent scar upon her neck or would have to subsequently lose two good teeth. Had the infection from the part of the diseased tonsil left in by reason of the negligence of defendants, caused the loss of an eye or a foot, we will say, instead of a scar upon the neck, it is possible that the law is such that no recovery could have been had unless the proof on plaintiffs' part showed that defendants, at the time of the negligent acts and treatment complained of, knew, or ought to have known, that

such dire consequences would be the result of such acts and treatment? If such should be held to be the law, then in many cases such an instruction would, in effect, be an instruction for a directed verdict. It is true that the text in the volume of California Jurisprudence cited supports the instruction in question. The learned writer of this text has cited several California cases as supporting the proposition of law set forth in the text. A careful reading of these cases, however, shows that this proposition of law, as stated in this text, finds no support in any of such cases. Nor have we found any authority, in this or any other jurisdiction, in accord with the doctrine set forth in California Jurisprudence and contended for by appellants. We, therefore, conclude that such contention is against reason and is not the law. In passing, we might say that had such offered instruction been modified to the extent of only requiring plaintiffs to prove that the defendants knew, or ought to have known, that *serious* consequences would result from their acts or treatment, instead of "the consequences complained of", same would then have been a proper instruction. At any rate, we find from an examination of the instructions given by the court, that the jury was fully and fairly instructed in the law governing a case of this character.

As to the only remaining point involved in this appeal, we feel that same hardly merits consideration. Counsel for plaintiffs introduced, without objection, a letter written to them by defendants under date of May 21, 1927. In this letter the following statement, among others, appears: "Also we offered to correct free of charge any error of technique in the removal of Mrs. Ingamells' tonsils, even offering also free of charge, the services of a Los Angeles specialist who Mr. and Mrs. Ingamells desire to do the work." The letter was identified and put in evidence while the defendant Dr. Goodfellow was on the witness-stand and under examination by plaintiffs' counsel, who first stated when offering the letter that same was offered for impeachment purposes, but later in the discussion which followed stated that same was offered for the purpose of showing an admission of an error in technique. Upon taking the witness for examination counsel for appellants then sought to have him explain the various statements contained in the letter, claiming that he

had the right to have each and every word and line contained therein explained and interpeted by the writer of the letter. The court, under objection by counsel for plaintiffs, refused to allow this to be done, and properly so. However, we find that later on when Dr. Goodfellow was upon the witness-stand in behalf of the defendants, and under examination by his own counsel, he did, without objection, explain what he meant by writing the above-mentioned passage. We are satisfied that no prejudice resulted from his not having been given the opportunity to explain the other passages contained in the letter.

The judgment is affirmed.